IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2025 at Knoxville

## STATE OF TENNESSEE v. BRYANT DONALDSON, JR.

**Appeal from the Criminal Court for Wilson County**
**No. 20-CR-119     Brody N. Kane, Judge**

———————————————————————

### No. M2024-00660-CCA-R3-CD

———————————————————————

Defendant, Bryant Donaldson, Jr, pled guilty to one count of especially aggravated sexual exploitation of a minor and six counts of aggravated statutory rape, with the trial court to determine the manner and length of sentence. After a sentencing hearing, the trial court imposed an effective twenty-three-year sentence. Defendant appeals, arguing that the trial court erred in admitting his psychosexual evaluation and a victim impact statement at sentencing and that the trial court misapplied enhancement factors. Upon our review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Daniel J. Turklay, Lebanon, Tennessee, for the appellant, Bryant Donaldson, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Jason Lawson, District Attorney General; and Thomas Harwell Swink, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

On February 12, 2020, Defendant was indicted for one count of especially aggravated sexual exploitation of a minor (count one), six counts of statutory rape by an authority figure (counts two through seven), and six counts of aggravated statutory rape (counts eight through thirteen). The case proceeded to trial on July 27, 2021. After the State completed voir dire, a plea agreement was reached. Pursuant to the plea agreement,

Defendant pled guilty to counts one and eight through thirteen in exchange for the dismissal of counts two through seven. The trial court would determine the length and manner of sentence. We note that the appellate record does not contain a transcript of trial proceedings or of Defendant's plea submission. *See State v. Keen*, 996 S.W.2d 842, 843-44 (Tenn. Crim. App. 1999) ("[A] transcript of the guilty plea hearing is often (if not always) needed in order to conduct a proper review of the sentence imposed."); Tenn. R. App. P. 24(b) (stating that the appellant has the duty to prepare a record which conveys a "fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"). An appellate who fails to include the transcript of the guilty plea hearing in the record risks waiver of a sentencing issue. This court determines on a case-by-case basis whether the record is sufficient for meaningful review without the inclusion of the plea submission transcript. *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). In this case, we will consider the merits of Defendant's sentencing issues because the facts of the offense are sufficiently stated in the presentence report. The relevant facts underlying the plea, as provided in the presentence report, are as follows:

> On January 11, 2020, . . . officers with the Wilson County Sheriff's Department were dispatched to [the victim's house regarding] a possible rape. Detectives arrived at the residence, where the 14[-]year[-]old female victim . . . resided with her mother and others, including the victim's 15[-]year[-]old sister and [Defendant]. Upon arrival detectives made contact with the victim's mother, who[] advised that she had checked [the victim's] phone and found a picture of a penis and a video of [the victim] in a sexual act with [Defendant]. She advised that she recognized the location that the video was taken as in the laundry room . . . . The phone was placed into evidence and the laundry room photographed. At this time the victim was being taken to [S]ummit [H]ospital by her grandmother. Detectives then received a call from Summit Hospital Emergency Room nurse stating that the victim was being transported to Our Kids (Nashville General Hospital) to have a sexual assault kit conducted. After leaving [the victim's house], deputies transported [Defendant] to the Sheriff's Department to be interviewed. Detectives met with [Defendant] at the Sheriff's [D]epartment and upon being advised of his rights[, Defendant] agreed to speak with detectives. [Defendant] was asked about his relationship with the victim and [Defendant] stated that "she looks up to him" and that they just sit around and talk. [Defendant] was then asked if he had had any sexual contact with the victim and he denied having any sexual relationship with her. Detectives explained the video evidence they ha[d] in which showed [Defendant] and the victim engaging in a sexual act. [Defendant] denied a sexual act and argued that detectives did not have a video of him. He stated that he has only had a parenting[,] role model type relationship with the victim. Upon being

asked if he had taken any type of drugs, [Defendant] stated that he takes drugs on a daily basis and had used earlier the same day but would not elaborate on what drugs he had taken.  It was determined that the subject was under the influence at that time and the interview was stopped. . . .

On January 13, 2020[,] the victim's mother stated to detectives that she had just found out that her other daughter (K.R.) had also been approached by [D]efendant in a sexual manner.  A forensic interview was then conducted with the victim at the child advocacy center on the date of January 13, 2020.  During this interview the victim reported that she understood that she is here to talk about Bryant "bubba" Donaldson and what happened.  She stated that [Defendant] is Sierra's brother (Sierra lives with them).  She reported that the incidents started around August of 2019 in which she and [Defendant] began talking as friends and about a month after things progressed.  She stated that he would tell her that he loved her, wanted to marry her and have kids with her.  She stated that a few days prior to the interview they had sex.  She stated that her mother went through her phone and found pictures and video of her and [Defendant].  She stated that her grandmother then drove her to Summit Hospital and then to Our Kids.  She stated that the incident on Saturday was not the only time they had sex, the first time was around August or September 2019.  She stated that [Defendant] would touch her body all over before they had sex (breasts, legs, vagina).  She stated that the first time they had sex was in the basement of her mother's house on the couch.  After they had sex, she stated that [Defendant] would digitally penetrate her vagina.  She stated that he did not use protection when they had sex.  She reported that they had sex multiple times.  She stated that the first time they had sex it did hurt her for a few seconds but did not hurt later.  She stated that on Saturday (January 11, 2020) they had sex with him penetrating her vaginally standing behind her with her hands on the wall.  She stated that she performed oral sex on [Defendant] twice, all incidents did occur in the basement.  She stated that everyone else was usually upstairs in the home when they had sex.  When they had sex he would ejaculate both outside and inside of her.  She stated that after the first time she told her sister (K.R.).  Later on January 13, 2020[,] the victim's sister (K.R.) was interviewed at the child advocacy center, with her mother present.  K.R. stated that she has known [Defendant] for approximately [ten] years and they refer to him as "bubba."  She reported that [Defendant] had moved in with them in June 2019 but sometimes stays with his sister Brandy in Gordonsville.  She stated that [Defendant] does not have a phone, car or a job and is often at home when everyone else is gone.  Upon being asked about the sleeping arrangements of the household[,] K.R. states that he often slept in her

mother's room or downstairs in the basement. She stated that everyone else slept in bedrooms on the main floor of the house. She was then asked about the sexual incidents between her sister and [Defendant] and she stated that she had not seen the incidents but described an incident in which the three of them were downstairs and she could hear the victim and [Defendant] whispering. Upon asking what they were whispering about[,] [Defendant] told her that they were making a bet that on whether she (K.R.) would have sex with him or with them. She states that she told them that she wouldn't and they stopped discussing it. She states that [Defendant] told her that he and the victim were "interrupted" earlier that day and they were going to finish. She then states that [Defendant] and the victim then went into the victim's room to "finish." She states that this occurred about a week and a half ago. She then spoke of another incident in which they were at [Defendant]'s sister's house in Gordonsville and she was babysitting his sister's kids. She states that while they were there he typed "will you have sex with me, I will give you money or something you want" into his phone and showed it to her. She stated that she again refused. She stated that these were the only times he asked her to do it but that he frequently made "sly comments" about it to her. She stated that she had asked the victim about her sexual relationship with [Defendant] and she states that the victim told her that she (the victim) and [Defendant] had had sex "too many times to count." Interviewer then spoke to K.R. about the difficulties of this type of interview and the importance for her to be open and honest and that she was not in any kind of trouble. K.R. then stated that in that case, there was another incident in which one day [Defendant] had yelled at her to come into the laundry room that he had something to tell her and when she went in he began kissing her and he put his hand down her pants and she told him to stop. On May 25, 2020[,] the [Tennessee Bureau of Investigation ("TBI")] crime lab issued a report indicating their analysis of the sexual assault kit and report revealed the . . . sperm found on the victim's labia and vaginal swabs were a DNA match to [Defendant].

On March 21, 2022, the trial court conducted a sentencing hearing. Defendant's presentence report, which included the victim's mother's victim impact statement, was admitted into evidence. As noted in the presentence report, Defendant reported that he "was out of [his] mind" when the victim "approached [him] and [he] allowed it to happen." The report also showed a confirmed gang affiliation and Defendant's criminal history which included convictions for aggravated robbery and failure to appear. Regarding his aggravated robbery conviction, Defendant was sentenced to eight years suspended to probation; following two violations, his probation was revoked. Defendant reported his mental health as "poor" and admitted to alcohol and drug problems. He first drank alcohol

at age thirteen, used heroin from 2018 until his arrest in 2020, and used methamphetamine and marijuana from "2007 / 2008 until his arrest in 2020." Defendant reported that his drug and alcohol use contributed to his current charges. Defendant's Strong-R Risk and Needs Assessment resulted in risk score of "high."

The State then read the victim's mother's victim impact statement into the record. In the statement, the victim's mother expressed that Defendant had "taken [her] child's innocence away" and caused the victim to be "full of anger and rage and hate." The victim's mother questioned whether Defendant had "put together a big master plan to use [her] so [he] could get to [her] girls[.]" She expressed her belief that this was not an isolated incident and "pray[ed] . . . that no little girl is ever around" Defendant again. The victim's mother requested Defendant receive the maximum sentence.

Defendant objected to the State's reading of the victim impact statement, acknowledging that the victim has a right to put a statement into the record but requesting that the trial court "not consider any hearsay that was contained in the statement as substantive evidence against [Defendant], things that, you know, the child victim might have said, you know, to the mother, specifically." The court noted the victim impact statement had not been subjected to cross-examination and stated it would "grant it the weight it's due, based on what [it's] heard."

Defendant's psychosexual evaluation was also admitted into evidence. Defendant noted that he had "assumed" that the doctor who conducted the evaluation would testify but acknowledged that the report was likely admissible even without the doctor's testimony. However, "to the extent that [he was] wrong about that and the statute doesn't specifically allow that in," Defendant maintained his objection to the admission of the psychosexual evaluation without an opportunity to cross-examine the doctor.

The psychosexual evaluation included information regarding Defendant's current mental status, his family and interpersonal relationships, academic and criminal history, and psychiatric and substance abuse history. It also included questionnaires, objective testing, and tools to determine Defendant's risk to reoffend. According to Defendant's version of events, the victim "was the aggressor" and was "throwing herself" at him until "eventually [Defendant] gave in." Defendant stated that the victim performed oral sex on him, but he denied sexual intercourse. He "dismissed the DNA evidence as [in]valid" and asserted the victim and witness statements were incorrect and the victim's mother "got everybody to go against" him. Ultimately, the evaluating doctor determined that Defendant's risk for engaging in sexual misconduct was "well above average[.]"

Brandi Donaldson, Defendant's sister, testified that she had witnessed the victim consume alcohol, smoke marijuana, and make sexual advances on grown men. Ms.

Donaldson stated that Defendant is "a really good person" who had not been given the chance he needs and "falls victim to trying to fit in and do what other people want from him." Defendant introduced five certificates of completion for behavioral and Bible classes he had obtained while incarcerated.

The trial court stated that it had considered the evidence at the sentencing hearing, the presentence report, the principles of sentencing and arguments on sentencing alternatives, the nature of the criminal conduct, evidence regarding mitigating and enhancement factors, statistical information from the administrative office of the courts on sentencing and Defendant's potential for rehabilitation and treatment. It found Defendant to be a Range I standard offender and noted that count one was a non-probateable offense required to be served at 100%. The trial court found that mitigating factor one, that the criminal conduct neither caused nor threatened serious bodily injury, applied but did not "put a whole lot of weight on it." *See* T.C.A. § 40-35-113(1).

Regarding enhancement factors, the trial court "put a great deal of credit" on Defendant's conviction for failure to appear and "extensive, long-term" drug use because "the best predictor of future performances is past behavior[.]" *See id.* § -114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). It also applied enhancement factor seven, that the crime was committed to gratify Defendant's desire for pleasure and excitement. *See id.* § -114(7). The court noted that Defendant was in a sexual relationship with the victim's mother, "a willing sex partner that's more your age[,]" when he undertook this sexual relationship with "this child" and ejaculated during the sexual encounter. Based on Defendant's two prior probation violations, the trial court found that Defendant had failed to comply with the conditions of a sentence involving release into the community. *See id.* § -114(8). Finally, the trial court found that Defendant violated a position of private trust because Defendant was "involved in a parental role for this child" and the victim's mother "trusted [Defendant] enough to have him in the house" with her children. *See id.* § -114(14).

The trial court sentenced Defendant to eleven years for count one and four years each for counts eight through thirteen. After considering the "aggravating circumstances," it found that partial consecutive sentencing was appropriate because Defendant was convicted of more than two offenses involving sexual abuse of a minor. *See id.* § 40-35-115(a)(5). It ordered that counts nine and ten be served consecutively to count one, and that eight, eleven, twelve, and thirteen run concurrently with each other but consecutively to counts one, nine, and ten, for an effective sentence of twenty-three years.

On March 21, 2022, the trial court entered a written order containing its oral findings. Defendant filed a timely motion for new trial on April 20, 2022, which was

subsequently amended on May 8, 2023. The trial court denied Defendant's motion for new trial via written order on April 4, 2024.[1] Defendant's timely appeal is now before this court.

## Analysis

### I. Admission of Evidence

On appeal, Defendant argues that the psychosexual evaluation and the victim impact statement were inadmissible hearsay, and their admission at the sentencing hearing violated his rights under the confrontation clause because the authors of the documents did not testify. The State argues that the trial court properly admitted the psychosexual evaluation and the victim impact statement. We agree with the State.

Both the United States and Tennessee constitutions provide criminal defendants the right to confront witnesses against them. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "The admission of testimonial hearsay at trial, without a showing of unavailability and an opportunity to cross-examine, generally violates a defendant's right to confront adverse witnesses." *State v. Harris*, No. M2008-01685-CCA-R3-CD, 2009 WL 1871919, at *6 (Tenn. Crim. App. June 30, 2009) (citing *Crawford v. Washington*, 541 U.S. 36, 50 (2004)). However, this court has repeatedly held that "the Confrontation Clause is not applicable to sentencing hearings." *State v. Bonds*, 502 S.W.3d 118, 150 (Tenn. Crim. App. 2016) (first citing *State v. Whited*, No. E2013-02523-CCA-R3-CD, 2015 WL 2097843, at *10 (Tenn. Crim. App. May 4, 2015), *rev'd on other grounds*, 506 S.W.3d 416 (Tenn. 2016); then citing *State v. Boyd*, No. W2009-00762-CCA-R3-CD, 2010 WL 1240720, at *8 (Tenn. Crim. App. Mar. 30, 2010); then citing *Harris*, 2009 WL 1871919, at *6; and then citing *State v. Stephenson*, 195 S.W.3d 574, 590 (Tenn. 2006), *abrogated on other grounds by State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012)). Thus, Defendant's argument that the victim impact statement and the psychosexual evaluation violated his rights under the confrontation clause are unavailing.

The Tennessee Rules of Evidence apply at sentencing except that reliable hearsay "may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted[.]" T.C.A. § 40-35-209(b). Examples of reliable hearsay include certified copies of convictions or documents and presentence reports. *State v. Richmond*, No. M2021-01025-CCA-R3-CD, 2022 WL 4372220, at *11 (Tenn. Crim. App. Sept. 22, 2022) (citing *State v. Baker*, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997)), *no perm. app.*

---

[1] The reasons for the approximate one-year delay between the original and amended motion for new trial and the trial court's entry of a written order denying the motion are unclear from the record. However, neither party raises the issue on appeal.

*filed*; *see Jenkins v. State*, E2010-00938-CCA-R3-PC, 2011 WL 810770, at *5 (Tenn. Crim. App. Mar. 9, 2011) (concluding that the petitioner could not establish prejudice stemming from counsel's failure to object to admission of the presentence report because "it is settled law that the presentence report is reliable hearsay and is admissible during sentencing hearings").

When a defendant is convicted of a sex offense, which includes aggravated statutory rape, and is eligible for an alternative sentence, a psychosexual evaluation "*shall* be included as part of the presentence report and *shall* be considered by the court[.]"  T.C.A. § 39-13-705(b) (emphasis added).  Additionally, "[p]rior to imposition of sentence in a felony case, the department of correction shall prepare a written victim impact statement as part of the presentence report on the defendant."  *Id.* § 40-38-205.  Thus, both the psychosexual evaluation and the victim impact statement were part of the presentence report, and the "trial court is entitled to rely on the presentence report 'absent a showing that the report is based upon unreliable sources or is otherwise inaccurate.'"  *State v. Rogers*, No. W2021-00807-CCA-R3-CD, 2022 WL 2733698, at *9 (Tenn. Crim. App. July 14, 2022) (quoting *State v. Crossman*, No. 01C01-9311-CR-00394, 1994 WL 548712, at *6 (Tenn. Crim. App. Oct. 6, 1994)), *no perm. app. filed*.  Because the psychosexual evaluation and victim impact statement are not constitutionally prohibited and are explicitly authorized by statute, such evidence is admissible so long as it is reliable, and Defendant was provided the opportunity to rebut the evidence.  *See State v. Moss*, 13 S.W.3d 374, 385 (Tenn. Crim. App. 1999); T.C.A. § 40-35-209(b).

The victim impact statement was attached to the presentence report.  It included both the Tennessee Department of Correction ("TDOC") Victim Impact Statement form, which was filled out, signed, and dated by the victim's mother and a typed statement from the victim's mother on a separate page.  *See Harris*, 2009 WL 1871919, at *6 (citing *State v. Garner*, No. M1999-01427-CCA-R3-CD, 2000 WL 1681022, at *3 (Tenn. Crim. App. Nov. 9, 2000)) (stating that a victim impact statement's inclusion in the presentence report operated to verify the hearsay's reliability).  While the typed statement does not include the victim's mother's name or signature, it does include the style of the case and the victim's mother indicated on the TDOC form to "see attached."  Additionally, the substance of the typed statement makes clear the victim's mother wrote the statement.  To the extent the written statement included details of the circumstances surrounding the offenses, such details explained the impact of Defendant's crimes on the victim and her family.  We conclude that the victim impact statement was sufficiently reliable and, thus, was properly admitted and considered by the trial court.

Regarding the psychosexual evaluation, Defendant has presented no evidence that the psychosexual evaluation contained inaccuracies or was otherwise unreliable.  We note that Defendant asserts in his brief that "there is nothing in the record authenticating [the

psychosexual evaluation] as actually being the full, final, and complete document[.]" However, Defendant did not raise this objection at sentencing or in his motion for new trial. Thus, Defendant has waived any objection to the authenticity of the psychosexual evaluation. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Avila-Salazar*, No. M2023-01649-CCA-R3-CD, 2024 WL 3738647, at *2 (Tenn. Crim. App. Aug. 9, 2024) (stating that a party cannot raise an issue for the first time or change their argument on appeal), *perm. app. denied* (Tenn. Jan. 24, 2025). The trial court did not err in admitting and considering the psychosexual evaluation because the right to confront witnesses does not extend to sentencing proceedings, and the trial court was required to consider the psychosexual evaluation in sentencing Defendant for counts eight through thirteen.

Defendant is not entitled to relief on this basis.

## II. Enhancement Factors

Defendant argues that the trial court erred by applying enhancement factors seven and fourteen because there was no evidence that the offenses were committed to satisfy Defendant's desire for pleasure and excitement other than the inherent sexual nature of Defendant's crimes or that he abused a position of private trust. [2] The State asserts that the trial court properly applied these factors, and in the alternative, any error was harmless because the trial court imposed a within-range sentence after applying two unchallenged enhancement factors. We agree with the State.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). This court reviews sentencing decisions under an "abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)).

---

[2] In his brief, Defendant directs this court's attention to enhancement factors seven and fourteen but fails to include proper citation to the applicable statute or any case law in support of his position. While Defendant's omission has not frustrated this court's review, we reiterate the importance of including proper authority in support of legal arguments. *See* Tenn. R. App. P. 27(a)(7)(a); Tenn. Ct. Crim. App. 10(b).

Once a trial court determines the appropriate range of punishment, the trial court must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report, including a validated risk and needs assessment; (3) any arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any applicable mitigating and enhancement factors; (6) any statement the defendant makes on his behalf; and (7) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee. T.C.A. § 40-35-210(a), (b). Additionally, the sentence imposed should be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence was imposed." *Id.* at § 40-35-103(2), (4).

When adjusting the length of a sentence within the appropriate range, a trial court is guided by, but not bound by, any applicable mitigating and enhancement factors. *State v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at *21 (Tenn. Crim. App. Apr. 2, 2024) (quoting *Bise*, 380 S.W.3d at 706), *perm. app. denied* (Tenn. July 17, 2024). It is within the trial court's sound discretion to weigh any applicable mitigating or enhancement factors. *State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15 (Tenn. Crim. App. Mar. 20, 2024) (quoting *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2007)), *no perm. app. filed*. Thus, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed" from the sentencing act. *Bise*, 380 S.W.3d at 706.

Here, the trial court found that Defendant was a Range I, standard offender. *See* T.C.A. § 40-35-105. The trial court imposed within-range sentences for each conviction. *See id.* § -112(a)(2), (a)(4) (mandating that a Range I sentence be between eight and twelve years for a Class B felony and between two and four years for a Class D felony). Additionally, the trial court imposed partial consecutive sentencing. *See id.* § -115(a)(5). Defendant does not challenge the manner or alignment of his sentences, and thus, this court will focus solely on his challenge to the trial court's application of enhancement factors seven and fourteen.

Defendant asserts that, in applying enhancement factor seven, the trial court improperly relied on the sexual nature of the offenses. Under Tennessee Code Annotated section 40-35-114(7), a trial court may enhance a defendant's sentence within the appropriate range if it finds that the "offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement[.]" This factor may not be applied to sexual offenses that require proof of motive, such as sexual battery, but may be applied to sexual offenses that require no proof of motive, such as rape. *State v. Kissinger*, 922 S.W.2d 482, 489-90 (Tenn. 1996) (noting that sexual battery requires proof that the defendant made sexual contact, which is defined as intentional touching "for the purpose of sexual arousal or gratification"). Neither especially aggravated sexual exploitation nor

- 10 -

aggravated statutory rape require proof of motive. *See* T.C.A. §§ 39-13-506(a), -17-1005(a), -17-1002(10).

"Essential to proper application of this factor is the determination of the defendant's motive for committing the offense." *State v. Osborne*, 251 S.W.3d 1, 26 (Tenn. Crim. App. 2007) (citing *State v. Arnett*, 49 S.W.3d 250, 261 (Tenn. 2001)). The State must provide "objective evidence of the defendant's motivation to seek pleasure or excitement" which may include evidence of "sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner[.]" *State v. Tice*, No. M2021-00495-CCA-R3-CD, 2022 WL 2800876, at *52 (Tenn. Crim. App. July 18, 2022) (quoting *Arnett*, 49 S.W.3d at 262), *perm. app. denied* (Tenn. Dec. 14, 2022). The fact that the defendant orgasmed is insufficient, without more, to prove the existence of this factor. *Kissinger*, 922 S.W.2d at 491. "Thus, while this factor can apply in a sexual offense, it must be shown that the circumstances surrounding the offense go beyond that which one would normally associate with sexual acts." *State v. Allen*, No. M2005-02808-CCA-R3-CD, 2006 WL 2380613, at *4 (Tenn. Crim. App. Aug. 16, 2006).

Here, the trial court applied enhancement factor seven, finding that Defendant ejaculated during the events and was in a relationship with the victim's mother. It expressed confusion as to why Defendant entered a sexual relationship with the victim despite having a consensual sexual relationship with the victim's mother. Further, the trial court considered the presentence report which established that the victim had told her sister that she and Defendant had sex "too many times to count," Defendant would "touch her body all over before they had sex (breasts, legs, vagina)," and Defendant told the victim he loved her and wanted to marry and have children with her. The victim also reported that after she and Defendant had sex, he would insert his finger into her vagina. *See State v. Yelton*, No. E2018-01436-CCA-R3-CD, 2019 WL 2475171, at *8 (Tenn. Crim. App. June 13, 2019) (affirming application of enhancement factor seven because the "evidence presented at trial and in the presentence report established that the [d]efendant kissed the victim, fondled her breasts and buttocks, and inserted his finger into her vagina"). The victim's fifteen-year-old sister described when Defendant and the victim "were making a bet" about whether the victim's sister would sleep with Defendant, a separate incident when Defendant sexually assaulted the victim's sister, and another incident when Defendant again propositioned the victim's minor sister, all of which support a finding that Defendant sought sexual interactions from the young girls to satisfy his desire for pleasure and excitement. The evidence supports the trial court's application of enhancement factor seven.

Next, Defendant contends that the trial court erred by applying enhancement factor fourteen. He notes that the State ultimately dismissed counts two through seven, and thus,

Defendant "did not admit, even through virtue of his guilty plea, that he abused a position of public or private trust." Under Tennessee Code Annotated section 40-35-114(14), a trial court may enhance a defendant's sentence if the defendant abused a position of private trust in the commission of the offense. "[A]pplication of the factor requires a finding, first, that defendant occupied a position of trust" and then a determination of "whether the position occupied was abused by the commission of the offense." *Kissinger*, 922 S.W.2d at 488. The position of private trust is dependent on the nature of the relationship, not on the formality, and our supreme court has noted that the positions of "parent, step-parent, babysitter, teacher, [and] coach" are a few "obvious examples." *Id.* An adult who lives with a minor "occupies a position of 'presumptive private trust' with respect to the minor." *State v. Gutierrez*, 5 S.W.3d 641, 645 (Tenn. 1999).

Here, the trial court found that Defendant abused a position of private trust because Defendant told law enforcement that he occupied a "parental role" for the victim. The trial court further noted that Defendant lived in the home with the victim, dated and engaged in a sexual relationship with the victim's mother, and the victim's mother "trusted him to leave the [victim] alone with him." These findings are more than adequately supported by the record, particularly the presentence report which noted that Defendant stated that the victim "looked up to him," as well as the victim's sister's statement about the length of time the family had known Defendant. *See Kissinger*, 922 S.W.2d at 489 (finding that the defendant occupied a position of private trust because he had a long friendship with the victims' mother and the victims' mother trusted him with the care of the boys); *State v. Chaves-Abrego*, No. M2019-01686-CCA-R3-CD, 2021 WL 50252, at *9 (Tenn. Crim. App. Jan. 6, 2021) (upholding trial court's finding that the defendant "was in a position of private trust with the victims' parents and that he abused that position of private trust" without regard to whether the defendant was in a position of private trust with the minor victims). The evidence supports the trial court's application of enhancement factor fourteen.

Finally, we note that even had we determined that the trial court erred in the application of either or both enhancement factors discussed above, the trial court applied two other enhancement factors Defendant does not challenge. *See State v. Ambrose*, No. M2023-00097-CCA-R3-CD, 2024 WL 3596231, at *10 (Tenn. Crim. App. July 31, 2024) (citing *State v. Dotson*, 450 S.W.3d 1, 103 (Tenn. 2014)) (noting that "the application of a single enhancement factor supports an enhanced sentence"), *perm. app. denied* (Tenn. Feb. 20, 2025).

Defendant is not entitled to relief because the trial court properly exercised its discretion in imposing a within-range sentence of twenty-three years.

**CONCLUSION**

For the foregoing reasons, the judgments of the trial court are affirmed.

s/ *Jill Bartee Ayers*

JILL BARTEE AYERS, JUDGE
